# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GRACE E. MOORE                               :
GREAT-GRANDCHILDREN                          :
TRUST OF 2006, WesBanco Trust and            :
Investment Services and Jefferey McCamic,    :
Trustees, individually and on behalf of all  :
others similarly situated,                   :     Case No.
P.O. Box 151                                 :
Wheeling, West Virginia 26003                :
                                             :     Judge
              and                            :
                                             :     Magistrate Judge
JOSEPH GORSHA,                               :
individually and on behalf of                :
all others similarly situated,               :
1228 Dandyview Drive                         :     **CLASS ACTION COMPLAINT**
Lower Burrell, Pennsylvania 15068            :
                                             :
              and                            :
                                             :     **JURY DEMAND**
DAMON FALDOWSKI,                             :     **ENDORSED HEREON**
individually and on behalf of                :
all others similarly situated,               :
10 Carriage Trade Drive                      :
Washington, Pennsylvania 15301               :
                                             :
              and                            :
                                             :
DAMON FALDOWSKI II,                          :
individually and on behalf of                :
all others similarly situated,               :
1037 Somerset Downs Boulevard                :
Hendersonville, Tennessee 37075              :
                                             :
              and                            :
                                             :
MARK FALDOWSKI,                              :
individually and on behalf of                :
all others similarly situated,               :
3140 Harvard Avenue, Apt. 1002               :
Dallas, Texas 75205                          :
                                             :
              Plaintiffs,                    :
                                             :

v.                                              :
                                                :
GULFPORT APPALACHIA, LLC                        :
713 Market Drive                                :
Oklahoma City, Oklahoma 73114                   :
                                                :
        and                                     :
                                                :
GULFPORT ENERGY CORPORATION                     :
713 Market Drive                                :
Oklahoma City, Oklahoma 73114                   :
                                                :
        and                                     :
                                                :
RICE DRILLING D LLC                             :
625 Liberty Avenue, Suite 1700                  :
Pittsburgh, Pennsylvania 15222                  :
                                                :
        and                                     :
                                                :
EQT PRODUCTION COMPANY                          :
625 Liberty Avenue, Suite 1700                  :
Pittsburgh, Pennsylvania 15222                  :
                                                :
        and                                     :
                                                :
EQT ENERGY, LLC                                 :
625 Liberty Avenue, Suite 1700                  :
Pittsburgh, Pennsylvania 15222                  :
                                                :
        and                                     :
                                                :
EQT CORPORATION                                 :
625 Liberty Avenue, Suite 1700                  :
Pittsburgh, Pennsylvania 15222                  :
                                                :
        and                                     :
                                                :
JOHN/JANE DOES 1 - 5                            :
ABC ENTITIES 1 - 5                              :
Names and addresses unknown                     :
                                                :
            Defendants.                         :

## CLASS ACTION COMPLAINT

Plaintiffs Grace E. Moore Great-Grandchildren Trust of 2006, Joseph Gorsha, Damon Faldowski, Damon Faldowski II, and Mark Faldowski, individually and on behalf of all others similarly situated, allege the following based on personal knowledge, investigation of counsel, and belief:

## I.  INTRODUCTION

1.  This is a class action for compensatory damages, injunctive relief, and other legal and equitable remedies arising from the systematic underpayment of royalties owed to Plaintiffs and the putative classes.

2.  This Class Action Complaint seeks class certification pursuant to Federal Rule of Civil Procedure 23(c).

## II.  JURISDICTION AND VENUE

3.  Jurisdiction arises pursuant to 28 U.S.C. § 1332(a) and (d) because (i) Plaintiffs and at least one member of the putative classes are citizens of a state different from Defendants, (ii) the amount in controversy exceeds $5 million exclusive of interest and costs, and (iii) none of the exceptions under 28 U.S.C. §§ 1332(d) apply to the instant action.

4.  Defendant Gulfport Energy is subject to the jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4 and 28 U.S.C. § 115(b)(2) because it is registered to do business in, and does business in, this District.

5.  Defendant EQT Corporation is subject to the jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4 and 28 U.S.C. § 115(b)(2) because it is registered to do business in, and does business in, this District.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and S.D. Ohio Civ. R. 82.1(b) because Defendants transact business in this District, a substantial part of the events giving rise to the claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## III.   **PARTIES**

7.     Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006 is a trust created under the laws of West Virginia, and this matter is brought through its trustees, Jeffery McCamic and WesBanco Trust and Investment Services.  Grace E. Moore Great-Grandchildren Trust of 2006 owns 155.84 acres of real property in Belmont County, Ohio.  Grace E. Moore Great-Grandchildren Trust of 2006 is the lessor of the oil and gas lease attached as Exhibit 1 and is the current lessor under that lease.

8.     Plaintiffs Joseph Gorsha, Damon Faldowski, Damon Faldowski II, and Mark Faldowski ("the Gorsha-Faldowski Plaintiffs") are the co-owners of approximately 37.525 acres of real property in Belmont County, Ohio.  They are the lessors of the oil and gas lease attached as Exhibit 2 and are the current lessors under that lease.

9.     Defendant Gulfport Energy Corporation is a Delaware corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma.

10.     Defendant Gulfport Appalachia, LLC, is a Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma, and is registered to do business in Ohio.

11.     Per Gulfport Energy Corporation's SEC filings, Gulfport Appalachia, LLC is a wholly owned subsidiary of Gulfport Energy Corporation. (Hereinafter, each may be collectively referred to as the "operator" or the "lessee" of the Grace E. Moore Great-Grandchildren Trust of 2006 lease, or collectively referred to as "Gulfport.")

12.    Per Gulfport's website, Gulfport is an independent natural gas-weighted exploration and production company focused on the exploration, acquisition, and production of natural gas, crude oil, and NGL in the United States with primary focus in the Appalachia and Anadarko basins. Its principal properties are located in Eastern Ohio targeting the Utica and Marcellus formations and in central Oklahoma targeting the SCOOP Woodford and SCOOP Springer formations. *See* https://www.gulfportenergy.com/about (last visited December 29, 2024).

13.    Regarding its operations in Ohio, Gulfport has approximately 193,000 net reservoir acres located primarily in Belmont, Harrison, Jefferson, and Monroe Counties in eastern Ohio where the Utica ranges in thickness from 600 to over 750 feet.

14.    During 2023, Gulfport produced approximately 784 MMcfe per day in Ohio, and it accounts for approximately 74% of Gulfport's total production.

15.    Gulfport is one of the top five natural gas producers in Ohio.

16.    Defendant Rice Drilling D LLC is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania.

17.    Defendant EQT Production Company is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

18.    Defendant EQT Energy, LLC is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania.

19.    Defendant EQT Corporation is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania.

20.    Defendants Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC are all indirect wholly owned subsidiaries of EQT Corporation.

5

21. Per EQT's website, EQT is an "independent natural gas producer" with "operations in Pennsylvania, West Virginia, and Ohio" with a focus on the Appalachian Basin. www.etq.com/about/ (last accessed 12/19/2024).

22. Per EQT's website, "EQT operates Utica wells throughout its Ohio acreage and as of December 31, 2020, had approximately 0.9 trillion cubic feet of proved Ohio Utica reserves." www.etq.com/operations/production/ (last accessed 12/19/2024).

23. In addition, per EQT's website, "EQT owns or leases approximately 65,000 net acres in eastern Ohio and is actively developing the Utica Shale in Belmont County." www.etq.com/operations/production/ (last accessed 12/19/2024).

24. EQT Corporation, through its various subsidiaries, is the largest producer of natural gas in the United States. https://www.eqt.com/operations/production

25. Defendant EQT Corporation does business in Ohio as Rice Drilling D LLC, which is located at the same address as EQT Corporation. (Hereinafter, any reference to "EQT Corporation" or "EQT" shall include Rice Drilling D LLC.)

26. Jane/John Does 1 – 5 and ABC Entities 1 – 5 are individuals or entities, whose identities and involvement are currently unknown to Plaintiffs, but who are believed to be liable to Plaintiffs or have acted in concert with the Defendants or otherwise engaged in actions that are illegal or in breach of the lease agreements at issue, which would subject them to liability for the claims asserted in this Class Action Complaint.

IV.    **FACTUAL ALLEGATIONS**

    A.    **Background**

27.    The Utica Shale lies under New York, Pennsylvania, Ohio, and West Virginia, as well as extending into parts of Kentucky, Maryland, Tennessee, and Virginia.

28.    Historically, drilling consisted of boring straight into the earth to extract minerals or gas.  Soon, technology allowed wells to be drilled at an angle without much curve.  As technology improved, the distance in which the wellbores could go from vertical to horizontal decreased, allowing one well to access many more acres of natural gas reserves between wells.

29.    Natural gas from the Utica Shale is located within a sub-surface geologic shale formation and is extracted using recent horizontal drilling and hydraulic fracturing methods known as "fracking."

30.    Since approximately January 1, 2010, Ohio has seen remarkable growth in natural gas drilling in the Utica Shale.  This growth came about based upon recent technology that provided a means to access, produce, and profit from the natural gas trapped within this formation.  *See* Kristen Allen, *The Big Fracking Deal: Marcellus Shale – Pennsylvania's Untapped Resource*, 23 Vill. Envtl. L.J. 51, 54 n.26 (2012).

31.    Before this technology came about, there was no practical way of accessing the natural gas trapped within the Utica shale, not to mention other shales in the United States.  *Id.* at 54-55.

32.    The result of this technology was a swell in gas production out of the Utica Shale. Companies quickly realized the profits that could be made by employing horizontal

drilling. As a result, there was an aggressive race to lease mineral rights from as many landowners as possible.

33. In exchange for the privilege to extract natural gas from landowners' properties, lessees pay a "royalty." The royalty payment is a payment of a percentage of the revenue generated from the sale of oil or natural gas produced from the lessor's property. The royalty rates historically were paid at 12.5%, but with the advent of the recent "shale boom," royalties have risen to as high as 21%.

34. Traditionally, lessees of gas rights did not shift costs to the lessors; however, even in the absence of language permitting any cost-shifting, lessees have started charging back "post-production" costs to the landowners.

35. Because not every landowner has enough acreage on which to drill a well, many leases contain what are called "unitization" clauses. A unitization clause allows the lessee to aggregate all, or a portion, of a lessor's land to create a pool of neighboring lands that in combination create a suitable drilling unit.

36. In the Utica Shale, these developers typically desire units of 640 acres to over 1,000 acres given that they are drilling horizontally. Thus, royalties for each lessor are calculated based on the amount of the lessor's land contained within the drilling unit.

37. Once the natural gas and its related hydrocarbons (such as oil, condensate, and natural gas liquids) are reached through the fracking process, a wellhead is placed on the well bore. After the wellhead is placed, natural gas is moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline. Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the

United States. The method of moving the raw natural gas from the various wellheads to either a processing plant (for "wet" natural gas requiring the removal of heavier hydrocarbons) or to the point of delivery directly into an interstate transmission pipeline (for "dry" gas requiring no further processing), is referred to in the industry as "gathering."

38. Natural gas is often not in suitable form to be placed directly into an interstate transmission line and must undergo "processing" during the gathering process to remove water content and other impurities, as well as to separate the heavier hydrocarbons such as ethane, propane, butane, hexane, and others.

39. Natural gas must flow from higher pressure to lower pressure in order to move to the market, and operators typically must compress the natural gas at various points in order to effectuate the flow of the gas into transmission pipelines. This process is referred to in the industry as "compressing."

40. During the last ten years, Gulfport and its affiliated entities have been active in securing oil and gas leases, sub-leases, or lease assignments within eastern Ohio for the purpose of exploring for and producing natural gas, oil, and other liquid and gaseous hydrocarbons from the Utica Shale geologic formation.

41. During the last ten years, EQT Corporation and its affiliated entities have been active in securing oil and gas leases, sub-leases, or lease assignments within eastern Ohio for the purpose of exploring for and producing natural gas, oil, and other liquid and gaseous hydrocarbons from the Utica Shale geologic formation.

### B. Grace E. Moore Great-Grandchildren Trust of 2006

42. The royalties paid regarding Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's property provides a good example of how Gulfport treats the deduction

of post-production costs or expenses.  That property is burdened by a June 5, 2013 oil and gas lease between the Grace E. Moore Great-Grandchildren Trust of 2006, by its trustees, WesBanco Trust and Investment Services and Jeffery McCamic, and Rice Drilling D, LLC, a Pennsylvania limited liability company. The lease covers three parcels, consisting of 155.84 acres.  Lease attached as Exhibit 1.

43.    At some point, some or all of lessee's interest (the working interest) was assigned to Gulfport Appalachia, LLC, Gulfport Energy Corporation, or its affiliates.

44.    Regarding royalty payments, the lease provides for a 20% royalty and further states:

Royalty Payments: The Lessee shall pay to Lessor twenty percent (20%) of the proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment").  It is agreed between the Lessor and Lessee that, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid to Lessee for all Leased Products produced.  All Royalty Payments shall be paid to Lessor at the address recited above Article I in this Lease or at such other address as shall be provided by Lessor to Lessee in writing.

45.    Upon information and belief, Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's property is included within the drilling units for several oil and gas wells

that are owned and operated by Gulfport or its affiliated entities by virtue of the leasing rights granted in the aforementioned oil-and-gas lease.

46. Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006, as lessor, is entitled to royalty payments from the hydrocarbon production of these wells, to be paid according to the royalty provisions of the operative lease.

47. Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006 receives royalty payments from "Gulfport Appalachia, LLC" with associated royalty statements.

48. Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006 (through its trustees) noticed substantial "post-production" cost deductions from the royalty payment for items such as compression and gathering.

49. Although listed as deductions on the royalty statement, these deductions were not further explained, other than to specify "compression" and "gathering."

50. The deductions varied, often substantially, without any explanation or apparent good cause.

51. These deductions, when taken over the course of the life of these wells, have, and continue, to amount to substantial sums of lost royalty revenue to Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006.

52. Insofar as the lessee may be entitled to deduct any "post-production" expenses, the lessee (Gulfport or its affiliated entities) may *not* deduct for expenses related to any infrastructure or efforts that occur *before* the product (natural gas, oil, or condensate) reaches the point of sale to the market.

53. Stated differently, because the natural gas is not in marketable form *until* it meets the quality and pressure specifications of the interstate pipeline into which it is

delivered, the lessee may not deduct for any costs incurred to pressurize, gather, transport, or process the raw gas *before* it is placed into an interstate pipeline.

54. Indeed, per the subject lease and its addendum, Gulfport and its affiliated entities may only take deductions, in proportion to the lessor's royalty, if, and only if, such expenses are to *enhance* the value of already marketable oil, condensate, gas, or other products in order to receive a better price.

55. The high deductions indicate that Gulfport and its affiliated entities are arbitrarily deducting for their own expenditures for expenses associated with Gulfport's post-production operations in eastern Ohio in contravention of the subject lease and accepted industry standards.

56. Furthermore, based on an implied duty to market and also an implied duty to act as a reasonable prudent operator—duties imposed as a matter of law—Gulfport and its affiliated entities are obligated to market and sell their gas production at the highest price obtainable.

57. Notwithstanding, based on analysis the royalty statements provided to Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006, the price paid per MMBtu for natural gas is roughly 40% below local market rate, using the "TETCO M-2" Index Price as a basis, and given this price's similarity to the Rice Drilling D LLC prices paid to the Gorsha-Faldowski plaintiffs (discussed below), there is a strong indication that Gulfport is selling the natural gas to affiliated entities at sub-market prices, or otherwise is selling the natural gas at sub-market prices to the detriment of Plaintiffs.

58. The royalty provision in the lease with Grace E. Moore Great-Grandchildren Trust of 2006 specifically mandates that the royalty be paid based on the "proceeds

received from an unaffiliated third party purchaser in an arms length transaction at the point of sale . . . ."

59. Moreover, this lease defines "affiliate" as follows:

**Affiliate**: An "Affiliate" is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

60. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "gathering" expenses (as that term is defined within the industry) may not be deducted from Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty per the subject lease.

61. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "compression" expenses (as that term is defined within the industry) may not be deducted from Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty per the subject lease.

62. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "processing" expenses (as that term is defined within the industry) may not be deducted from Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty per the subject lease—unless such "processing" charges are to enhance (to increase) the value of an already marketable product. (Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty statements, to date, do not indicate any deductions for processing.)

63. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "transportation" expenses (as that term is defined within the industry) may not be deducted from Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty for any transportation expenses that occur *before the gas is placed in an interstate transmission pipeline* per the subject lease. "Transportation" expenses may only be deducted thereafter to the extent, and in proportion to the lessor's royalty interest, that the marketable, pipeline-quality "dry gas" has its value enhanced (increased) by such "transportation" expenses. (Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalty statements, to date, do not indicate any deductions for transportation.)

64. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, (a) the deduction must be reasonable, (b) the expense must have been incurred to enhance an already marketable product, and (c) the deduction must relate to an expense that caused the lessor's royalty to increase in proportion with the assessed costs. This is because the leases do not permit Gulfport to deduct impermissible deductions or to inflate the amount of permissible deductions, yet this is what the lessee Gulfport is doing.

65. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, *it is the lessee's burden* to establish that (a) the deduction is reasonable, (b) the expense was incurred to alter (enhance) an already marketable product, and (c) that the deduction relates to an expense that caused the lessor's royalty to increase in proportion with the assessed costs.

66. The law imposes an obligation upon all oil and gas lessees to act in good faith toward its lessors. Any enhancement must yield a better price and a better result

to the lessor than what could be obtained with the enhancement; for example, Gulfport cannot deduct a dollar to get a nickel in an increased sale price.

67. The "post-production" expenses taken from Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006's royalties are either not allowed per the lease, or, alternatively, have been and are being taken in improper amounts.

68. Gulfport's (and its affiliated entities) intentional actions and practice of deducting so-called "post-production" expenses from the royalty payments to Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006 is nothing more than a ruse, a method of taking money that rightfully belongs to Plaintiff Grace E. Moore Great-Grandchildren Trust of 2006.

### C.    Gorsha-Faldowski Plaintiffs

69. Plaintiffs Joseph Gorsha, Damon Faldowski, Damon Faldowski II, and Mark Faldowski ("the Gorsha-Faldowski Plaintiffs") receive oil-and-gas royalty payments from wells, or a drilling unit, that is operated jointly by Gulfport and Rice Drilling D, LLC. The main body of the lease contains the following provisions regarding the payment of royalties:

> (B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
>    1. OIL:  To deliver to the credit of Lessor, free of cost, a Royalty of the equal **Twenty Percent (20%)** part of all oil and any constituents thereof produced and marketed from the Leasehold.
>    2. GAS:  To pay Lessor an amount equal **Twenty Percent (20%)** of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

With the Addendum attached to the lease, the royalty provision contains another version of the market enhancement clause:

**_Market Enhancement Clause_**

It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

Lease attached as <u>Exhibit 2.</u>

70.   Upon information and belief, the Gorsha-Faldowski Plaintiffs' property is included within the drilling units for several oil and gas wells that are jointly operated by Gulfport and EQT Corporation, or their affiliated entities by virtue of the leasing rights granted in the aforementioned oil-and-gas lease.

71.   The Gorsha-Faldowski Plaintiffs, as lessors, are entitled to royalty payments from the hydrocarbon production of these wells, to be paid according to the royalty provisions of the operative lease.

72.   The Gorsha-Faldowski Plaintiffs receive royalty payments from both "Gulfport Energy" with associated royalty statements and also from EQT Corporation/Rice Drilling D LLC, with associated royalty statements.

73.   The Gorsha-Faldowski Plaintiffs' royalty statements reported substantial "post-production" cost deductions from the royalty payment for items such as compression, processing, and gathering.

74.   Although listed as deductions on the royalty statement, these deductions were not further explained, other than to specify "compression," "processing," and "gathering."

75.   The deductions varied, often substantially, without any explanation or apparent good cause.

76.  These deductions, when taken over the course of the life of these wells, have, and continue, to amount to substantial sums of lost royalty revenue to the Gorsha-Faldowski Plaintiffs.

77.  Insofar as the lessee may be entitled to deduct any "post-production" expenses, the lessee (Gulfport, EQT Corporation, or their affiliated entities) may *not* deduct for expenses related to any infrastructure or efforts that occur *before* the product (natural gas, oil, or condensate) reaches the point of sale to the market.

78.  Stated differently, because the natural gas is not in marketable form *until* it meets the quality and pressure specifications of the interstate pipeline into which it is delivered, the lessee may not deduct for any costs incurred to pressurize, gather, transport, or process the raw gas *before* it is placed into an interstate pipeline.

79.  Indeed, per the subject lease and its addendum, Gulfport, EQT Corporation, and their affiliated entities may only take deductions, in proportion to the lessor's royalty, if, and only if, such expenses are to *enhance* the value of already marketable oil, condensate, gas, or other products in order to receive a better price.

80.  The high deductions indicate that Gulfport, EQT Corporation, and their affiliated entities are arbitrarily deducting for their own expenditures for expenses associated with their post-production operations in Ohio in contravention of the subject lease and accepted industry standards.

81.  Based on an implied duty to market and also an implied duty to act as a reasonably prudent operator—duties imposed as a matter of law—Gulfport, EQT Corporation, and their affiliated entities are obligated to market and sell their gas production at the highest price obtainable.

17

82. Notwithstanding, based on analysis of the royalty statements provided to the Gorsha-Faldowski Plaintiffs from Gulfport, the price paid per MMBtu for natural gas is roughly 40% below local market rate, using the "TETCO M-2" Index Price as a basis, and given this price's similarity to the Rice Drilling D LLC prices concurrently paid to the Gorsha-Faldowski Plaintiffs (discussed below), there is a strong presumption that Gulfport is selling the natural gas to affiliated entities at sub-market prices, or otherwise is selling the natural gas at sub-market prices to the detriment of the Plaintiffs.

83. Furthermore, the royalties paid to the Gorsha-Faldowski Plaintiffs by EQT-Rice Drilling are also roughly 40% below the local market rate, using the "TETCO M-2" Index Price as a basis.

84. On or about November 13, 2017, EQT Corporation merged with Rice Energy, Inc.

85. Rice Drilling D LLC remained the Lessee of its leases in Eastern Ohio following the merger but became an indirect wholly owned subsidiary of EQT Corporation.

86. Following the EQT-Rice merger, EQT Production Company assumed the rights and obligations of the Lessee under all of the leases for which Rice Drilling D LLC had procured in Eastern Ohio and maintains those rights and obligations jointly and severally with Rice Drilling D LLC.

87. The collective EQT Defendants initially sell the hydrocarbons (the oil, gas, or natural gas liquids "NGLs") from the leased premises to an affiliate entity, believed to be EQT Energy, LLC, or some other affiliated entity.

88. The price this affiliate pays for these hydrocarbons is then used to calculate the royalties paid to the Gorsha-Faldowski Plaintiffs and other putative class members.

89. The collective EQT Defendants then sell the hydrocarbons again to an unaffiliated third-party purchase in an arm's length transaction at a substantially higher price.

90. The price that EQT Energy, LLC, or other affiliated entity, receives is always more than the price that the Plaintiffs receive by way of the initial sale.

91. In fact, the collective EQT Defendants are fully aware that their royalty-payment actions are illegal because EQT, and its affiliated entities, have been subject to multiple similar lawsuits filed in West Virginia arising from claims that EQT is paying royalties to its lessors based on the sub-market rates prices that EQT Production Company receives from its affiliate, EQT Energy, LLC, and not the market prices that EQT Energy, LLC received from non-affiliated third parties in arm's-length transactions. *See Mills Wetzel Lands, Inc. v. EQT Prod. Co.*, Case No. 5:18-cv-23 (N.D. W.Va); *see also* EQT Corporation's 2021 10-K which references a legal proceeding identified as "*Mary Farr Secrist, et al. v. EQT Prod. Co., et al., Circuit Court of Doddridge County, West Virginia*" and states that "[o]n June 27, 2018, the Court held that EQT Production Company and its marketing affiliate EQT Energy LLC are alter egos of one another and that royalties paid under the leases should have been paid on the price of gas produced under the leases when sold to unaffiliated third parties, and not on the price when the gas was sold from EQT Production Company to EQT Energy, LLC." *Securities and Exchange Commission, EQT Corporation 10-K for period ending December 31, 2020,* page 41; *see also W.W. McDonald Land Co. v. EQT Prod. Co.,* 983 F.Supp.2d 790 (S.D. W.Va. 2013)

92. The Gorsha-Faldowski Plaintiffs, and those similarly situation, should have been paid based on the price paid by the unaffiliated third-party purchasers, based upon

both the contractual language in the subject lease and upon the implied duty to market and also an implied duty to act as a reasonable prudent operator.

93. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "gathering" expenses (as that term is defined within the industry) may not be deducted from the Gorsha-Faldowski Plaintiffs' royalty per the subject lease.

94. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "compression" expenses (as that term is defined within the industry) may not be deducted from the Gorsha-Faldowski Plaintiffs' royalty per the subject lease.

95. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "processing" expenses (as that term is defined within the industry) may not be deducted from the Gorsha-Faldowski Plaintiffs' royalty per the subject lease—unless such "processing" charges are to enhance (to increase) the value of an already marketable product.

96. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, "transportation" expenses (as that term is defined within the industry) may not be deducted from the Gorsha-Faldowski Plaintiffs' royalty for any transportation expenses that occur *before the gas is placed in an interstate transmission pipeline* per the subject lease. "Transportation" expenses may only be deducted thereafter to the extent, and in proportion to the lessor's royalty interest, that the marketable, pipeline-quality "dry gas" has its value enhanced (increased) by such "transportation" expenses. (The Gorsha-Faldowski Plaintiffs' royalty statements, to date, do not indicate any deductions for transportation.)

97. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, (a) the deduction must be reasonable, (b) the expense must have been incurred to enhance an already marketable product, and (c) the deduction must relate to an expense that caused the lessor's royalty to increase in proportion with the assessed costs. This is because the leases do not permit Gulfport to deduct impermissible deductions or to inflate the amount of permissible deductions, yet this is what the lessee Gulfport is doing.

98. Further, insofar as the lessee may be entitled to deduct any "post-production" expenses, *it is the lessee's burden* to establish that (a) the deduction is reasonable, (b) the expense was incurred to alter (enhance) an already marketable product, and (c) that the deduction relates to an expense that caused the lessor's royalty to increase in proportion with the assessed costs.

99. The law imposes an obligation upon all oil and gas lessees an to act in good faith toward its lessors. Any enhancement must yield a better price and a better result to the lessor than what could be obtained with the enhancement; for example, the lessees cannot deduct a dollar to get a nickel in an increased sale price.

100. The "post-production" expenses taken from the Gorsha-Faldowski Plaintiffs' royalties are either not allowed per the lease, or, alternatively, have been and are being taken in improper amounts.

101. The intentional actions of Gulfport, EQT Corporations, and their affiliated entities and their practice of deducting so-called "post-production" expenses from the royalty payments to the Gorsha-Faldowski Plaintiffs is nothing more than a ruse, a method of taking money that rightfully belongs to the Gorsha-Faldowski Plaintiffs.

21

### D. Alter Ego

102. Defendant Rice Drilling D LLC is a wholly owned subsidiary of Rice Drilling B LLC.

103. Rice Drilling B LLC is a wholly owned subsidiary of EQT RE, LLC.

104. EQT RE LLC is a wholly owned subsidiary of Defendant EQT Production Company.

105. Defendant EQT Production Company is a wholly owned subsidiary of EQT Investment Holdings, LLC.

106. EQT Investment Holdings, LLC is a wholly owned subsidiary of Defendant EQT Production Corporation.

107. Defendant EQT Energy, LLC is a wholly owned subsidiary of Defendant EQT Production Company.

108. All of the EQT Defendants, including Rice Drilling D LLC, share the same corporate address of 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

109. Upon information and belief, after the EQT-Rice merger in 2017, Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC are, in reality and effect, divisions or business segments of and within EQT Corporation, the entity and corporate umbrella under which they operate.

110. EQT Production Company, EQT Energy, LLC and any other affiliate companies who paid or received the affiliate prices were created by EQT Corporation.

111. Many officers and key employees are employed or involved with all the entities.

112. David M. Khani is the Chief Financial Officer of EQT Corporation.

113. David M. Khani is a Director of EQT Production Company.

114. David M. Khani is a Manager of EQT Energy, LLC.

115. William E. Jordan is the Executive Vice President and General Counsel of EQT Corporation.

116. William E. Jordan is a Manager of EQT Energy, LLC.

117. Toby Z. Rice is the President and Chief Executive Office or EQT Corporation.

118. Toby Z. Rice is a Director and President of EQT Production Company.

119. Toby Z. Rice is a principal at Rice Drilling D LLC.

120. EQT Production Company, EQT Energy, LLC, and EQT Corporation have shared common management and direction.

121. After the EQT-Rice merger and Rice Drilling D LLC became an indirect wholly owned subsidiary of EQT Corporation, Rice Drilling D LLC also shared common management and direction.

122. EQT Corporation is the general manager of all other EQT Defendants, to include Rice Drilling D LLC, directly, or by and through another wholly owned subsidiary of EQT Corporation.

123. The EQT Defendants, including Rice Drilling D LLC, are predominantly staffed with officers and directors of EQT Corporation.

124. EQT Corporation finances the other EQT Defendants, including Rice Drilling D LLC.

125. EQT Corporation controls the resources and income of the other EQT Defendants, including Rice Drilling D LLC.

126. The EQT Defendants, including Rice Drilling D, have only the capital and resources which EQT Corporation authorizes and permits these subsidiaries to have, and as such, these EQT Defendants are mere departments or part of business segments that do not even have separate addresses and are not stand-alone businesses.

127. The EQT Defendants, including Rice Drilling D, are all housed in one building, primarily in one office complex, in Pittsburgh, Pennsylvania.

23

128. The Boards of Directors and Officers of the EQT Defendants, other than for EQT Corporation, are essentially treated as employees reporting to their supervisors who are officers or directors of EQT Corporation.

129. EQT Corporation's board of directors has control over each of the other EQT Defendant's budget, revenue, business, responsibilities, and employees.

130. EQT Corporation's board of directors monitors all operations of, and exercises oversight over, all other EQT Defendants through an Audit Committee, and these other EQT Defendants must obtain approval for significant expenditures, including capital expenditures, from EQT Corporation's Enterprise Risk Committee.

131. EQT Corporation is operating EQT Production Company, EQT Energy, LLC, and Rice Drilling D LLC, as if they were, in fact, part of EQT Corporation.

132. The EQT Defendants are collaterally estopped from claiming that they are not alter egos of each other because Courts have determined that EQT Production Company and EQT Energy, LLC to be alter egos of EQT Corporation. *Kay Co., LLC v. EQT Prod. Co.* 1:13-cv-151 (N.D. W.Va.) "Based on the foregoing, this Court finds that EQT Corporation is the alter ego of the subsidiary defendant [including EQT Production Company and EQT Energy, LLC] and of EQT Midstream Partners and that the defendants are alter egos of each other with respect to this civil action." No. 1:13-cv-151, 2017 WL 10436074, at * 26 (N.D. W.Va. Sept. 6, 2017).

133. For the foregoing reasons, Defendants EQT Production Company, EQT Energy, LLC, and Rice Drilling D LLC are alter egos of EQT Corporation, who together with EQT Corporation, comprise one entity.

## V.  **CLASS ACTION ALLEGATIONS**

134.  All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

135.  Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

136.  Plaintiffs seek to represent the following Classes:

1. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, one or more royalty payments from natural gas or oil wells located in Ohio, from Gulfport or its affiliated entities, at any time within the statute of limitations.

2. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, one or more royalty payments from natural gas or oil wells located in Ohio, from Rice Drilling D LLC, or EQT Production Company, or EQT Corporation, or its affiliated entities, at any time within the statute of limitations.

3. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Gulfport or its affiliated entities at any time within the statute of limitations, whose royalty payments had *compression* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

4. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Gulfport or its affiliated entities at any time within the statute of limitations, whose royalty payments had *gathering* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that

25

contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

5. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Gulfport or its affiliated entities at any time within the statute of limitations, whose royalty payments had *processing* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

6. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Gulfport or its affiliated entities at any time within the statute of limitations, whose royalty payments had *transportation* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

7. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Rice Drilling D LLC, or EQT Production Company, or EQT Corporation, or its affiliated entities, at any time within the statute of limitations, whose royalty payments had *compression* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as

26

"post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

8. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Rice Drilling D LLC, or EQT Production Company, or EQT Corporation, or its affiliated entities, at any time within the statute of limitations, whose royalty payments had *gathering* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

9. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Rice Drilling D LLC, or EQT Production Company, or EQT Corporation, or its affiliated entities, at any time within the statute of limitations, whose royalty payments had *processing* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

10. All persons or entities (including their predecessors and successors-in-interest) who have received, or who were entitled to receive, royalty payments from natural gas or oil wells located in Ohio, who were paid one or more royalty payments by Rice Drilling D LLC, or EQT Production Company, or EQT Corporation, or its affiliated entities, at any time within the statute of limitations, whose royalty payments had *transportation* expenses deducted, and whose operative lease contains a "Market Enhancement" provision or essentially identical provision. A "Market Enhancement" provision means an oil-and-gas lease that

27

contains limitations on the deduction of what are commonly known as "post-production expenses" for activities such as gathering, compressing, processing, or transportation, with such limitations based on (a) the "marketable form" of the oil, gas, or other product or (b) that the lessee either "enhance" the value or "receive a better price" for the oil, gas, or other product.

**Exclusions:** Excluded from these Classes are: (1) Gulfport, EQT Corporation, any of their affiliates, parents, subsidiaries, officers, directors, employees, legal representatives, successors, and assigns, and any entity in which Gulfport or EQT Corporation has a controlling interest, as well as that entity's officers, directors, employees, legal representatives, successors, and assigns, in addition to the judicial officers and their immediate family members and court staff assigned to this lawsuit; (2) any class members whose leases include a valid and enforceable provision that requires arbitration of disputes; (3) any class members who are otherwise included as certified class members in the pending case of *Gregor v. Rice Drilling D, LLC*, S.D. Ohio Case No 2:21-cv-3999; and (4) persons or entities whose royalties are paid per an overriding royalty interest or those with working interests.

137. Plaintiffs and the members of the putative classes reserve the right to modify or amend the definitions of the Classes listed above as appropriate throughout this litigation.

138. This lawsuit has been brought and may be properly maintained on behalf of the putative classes proposed herein under the criteria set forth in Federal Rule of Civil Procedure 23.

139. The members of the putative classes are so numerous that joinder of all members is impracticable. Upon information and belief, there are several hundred if not thousands of class members with Utica Shale leases with Defendants and corresponding royalty interests. The precise number of class members is unknown to Plaintiffs, but may be ascertained from Defendants' books, records, and publicly available sources. Class members may be notified of the pendency of this action

by recognized, Court-approved means of disseminating notice, which may include U.S. Mail, e-mail, Internet postings, and/or public notice in any variety of media.

140. There are questions of law and fact common to the putative classes. All of the putative class members have oil and gas leases to which Defendants are or were a party. All of the putative class members have also had deductions taken by Defendants from the putative class members' royalty payments during the period from the beginning of the applicable statute of limitations through the present. In addition, other common questions of law and fact include, but are not limited to, the following:

a. When the natural gas, or its constituent products, from the lease wells at issue in this lawsuit becomes marketable;

b. Whether Defendants are entitled to deduct "post-production" expenses as a matter of law;

c. Whether, even if Defendants are entitled to deduct any "post-production" expenses, Defendants may deduct for expenses related to any infrastructure or efforts that occur *before* the product (natural gas, oil, or condensate) reaches the point of sale to the market;

d. Whether Defendants are arbitrarily deducting for their own capital expenditures for compression, separation, processing, gathering, and transportation;

e. Whether Defendants are marketing and selling their gas production at the highest price obtainable;

f. Whether Defendants have sold gas in an unmarketable condition to affiliates who (i) perform the activities that are necessary to place the

gas in a marketable condition, and (ii) then sell the gas in a marketable condition at an increased price, *i.e.*, a fair market value;

g.     Whether Defendants pay royalties to the putative class members based on the sale of the unmarketable gas instead of the higher fair market value, which improperly imposes the costs of making the gas marketable on the putative class members;

h.     Whether, even if Defendants are lawfully permitted to deduct any "post-production" expenses, "gathering" expenses (as that term is defined within the industry) may be lawfully deducted from a lessor's royalty;

i.     Whether, even if Defendants are lawfully permitted to deduct any "post-production" expenses, "compression" expenses (as that term is defined within the industry) may be lawfully deducted from a lessor's royalty;

j.     Whether, even if Defendants are lawfully permitted to deduct any "post-production" expenses, "processing" expenses (as that term is defined within the industry) may be lawfully deducted from a lessor's royalty;

k.     Whether, even if Defendants are lawfully permitted to deduct any "post-production" expenses, "transportation" expenses (as that term is defined within the industry) may be deducted from a lessor's royalty for any transportation expenses that occur before the point of sale to the market;

l.    Whether, even if Defendants are lawfully permitted to deduct any "post-production" expenses, it is Defendants' burden to establish that: (i) the deduction is reasonable, (ii) the expense was incurred to alter (enhance) an already marketable product, and (iii) that the deduction relates to an expense that caused the lessor's royalty to increase in proportion with the assessed costs;

m.    Whether, even if Defendants are lawfully permitted to make deductions, any of the deductions that Defendants had previously made or are currently making satisfy any of the conditions to allow for such deductions; and

n.    Whether, even if Defendants are lawfully permitted to make deductions, any of the deductions that Defendants had previously made or are currently making satisfy any of the conditions to allow for such deductions and are accurate deductions based upon the reasonable costs and expenses incurred by Defendants.

141.    Regarding Classes 3 through 10, the "market enhancement" classes, there is no variation in the lease language that defeats predominance or commonality because all of the "market enhancement" leases involved here require enhancement that increases the value of the product price recovered to permit the deduction of the related costs or expenses.

142.    The claims of Plaintiffs are typical of the claims of the putative classes.

143.    The defenses of Defendants are also typical of the defenses that could be asserted against the members of the putative classes.

144. The factual and legal bases of Defendants' liability to Plaintiffs and the other members of the putative classes are similar, if not identical, and Defendants have acted on grounds generally applicable and injurious to all members of the putative class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the class and making injunctive or corresponding declaratory relief appropriate for the putative classes as a whole.

145. As the representative parties, Plaintiffs will fairly and adequately protective the interests of the putative classes.

146. Plaintiffs' counsel have substantial experience in prosecuting complex litigation, including class actions.

147. Neither Plaintiffs nor their counsel has any interest adverse to those of the putative classes.

148. Plaintiffs intend to prosecute this action vigorously.

149. Class treatment of the claims in this case is superior to the litigation of individual claims. Without a class action, Plaintiffs and the other members of the putative classes would likely have no effective remedy because the cost of litigating their claims would be prohibitive, particularly for those with royalty interests associated with small acreage. Class treatment of these claims also will conserve this Court's resources and the litigants' resources, will promote efficiency, and will ensure consistent treatment of claims. Use of the class action mechanism here presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.     CLAIMS FOR RELIEF

### CLAIM ONE
### BREACH OF CONTRACT

*CLASS NO. 1 AGAINST GULFPORT DEFENDANTS*
*(INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR*
*DEALING)*

150.    All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

151.    Defendants are bound to honor the contractual provisions in the form of leases related to the natural gas and hydrocarbons produced from the subject property.

152.    The above-described conduct constitutes multiple breaches of the express and implied obligations that Defendants owe to Plaintiffs and the members of the putative class under the terms of the operative lease agreements by the deductions taken to their royalty payments that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

153.    To wit, as detailed earlier, Gulfport underpays its lessors (those specified in Class No. 1) by using a depressed market price for natural gas and NGLs by selling the products to an affiliated entity, other otherwise to any entity that does not reflect the true market price for the various products, rather than obtaining the full market price of the products and paying the royalties based on that market price.

154.    Plaintiffs and the members of the putative class have suffered monetary damage, both past and future, as a result of these breaches. The amount of the damages will increase if Defendants continue to breach the contractual obligations regarding the royalty payments, as described above.

## CLAIM TWO
## UNJUST ENRICHMENT

### *CLASS NO. 1 AGAINST GULFPORT DEFENDANTS*
### *(IN THE ALTERNATIVE TO BREACH OF CONTRACT)*

155.    All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

156.    As an alternative to Plaintiffs' breach of contract claim, the above-described conduct further provides an unjust enrichment to Defendants. It would be inequitable and unjust for Defendants to retain the benefit of these deductions that rightfully belong to Plaintiffs and the members of the putative class that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

157.    Plaintiffs and the members of the putative class are entitled to all legal and equitable relief, including orders for restitution and equitable disgorgement, necessary to remedy this unjust enrichment.

## CLAIM THREE
## BREACH OF CONTRACT

### *CLASS NO. 2 AGAINST EQT DEFENDANTS, INCLUDING RICE DRILLING D LLC*
### *(INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR*
### *DEALING)*

158.    All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

159.    Defendants are bound to honor the contractual provisions in the form of leases related to the natural gas and hydrocarbons produced from the subject property.

160.    The above-described conduct constitutes multiple breaches of the express and implied obligations that Defendants owe to Plaintiffs and the members of the

putative class under the terms of the operative lease agreements by the deductions taken to their royalty payments that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

161.  To wit, as detailed earlier, Gulfport underpays its lessors (those specified in Class No. 1) by using a depressed market price for natural gas and NGLs by selling the products to an affiliated entity, other otherwise to any entity that does not reflect the true market price for the various products, rather than obtaining the full market price of the products and paying the royalties based on that market price.

162.  Plaintiffs and the members of the putative class have suffered monetary damage, both past and future, as a result of these breaches. The amount of the damages will increase if the Defendants continue to breach the contractual obligations regarding the royalty payments, as described above.

**CLAIM FOUR**
**UNJUST ENRICHMENT**

*CLASS NO. 2 AGAINST EQT DEFENDANTS, INCLUDING RICE DRILLING D LLC*
*(IN THE ALTERNATIVE TO BREACH OF CONTRACT)*

163.  All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

164.  As an alternative to Plaintiffs' breach of contract claim, the above-described conduct further provides an unjust enrichment to Defendants. It would be inequitable and unjust for Defendants to retain the benefit of these deductions that rightfully belong to Plaintiffs and the members of the putative class that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

165. Plaintiffs and the members of the putative class are entitled to all legal and equitable relief, including orders for restitution and equitable disgorgement, necessary to remedy this unjust enrichment.

## CLAIM FIVE
## BREACH OF CONTRACT

*CLASS NOS. 3 through 10 AGAINST ALL DEFENDANTS*

166. All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

167. Defendants are bound to honor the contractual provisions in the form of leases related to the natural gas and hydrocarbons produced from the subject property.

168. The above-described conduct constitutes multiple breaches of the express and implied obligations that Defendants owe to Plaintiffs and the members of the putative classes under the terms of the operative lease agreements by the deductions taken to their royalty payments that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

169. As detailed earlier, Defendants are underpaying the royalties owed to their lessors by failing to honor the terms of the applicable lease agreements that contain "market enhancement" provisions, or nearly identical equivalents.

170. Defendants are improperly deducting "compression" expenses, a type of post-production expense, from these putative class members' royalties, in contravention of the commands of their leases.

171. Defendants are improperly deducting "gathering" expenses, a type of post-production expense, from these putative class members' royalties, in contravention of the commands of their leases.

172. Defendants are improperly deducting "processing" expenses, a type of post-production expense, from these putative class members' royalties, in contravention of the commands of their leases.

173. Defendants are improperly deducting "transportation" expenses, a type of post-production expense, from these putative class members' royalties, in contravention of the commands of their leases.

174. Plaintiffs and the members of the putative classes have suffered monetary damage, both past and future, as a result of these breaches. The amount of the damages will increase if Defendants continue to breach the contractual obligations regarding the royalty payments as described above.

175. Further, compensatory damages alone will be insufficient to provide a remedy to the Plaintiffs and members of the putative classes, requiring injunctive relief.

176. Without injunctive relief, Plaintiffs and the members of the putative classes will be (1) irreparably injured without such an injunction, as payment of past damages without such an injunction will require the Plaintiffs to file repeated lawsuits to address recurring breaches and always to remedy past damages; (2) remedies at law are inadequate insofar as such remedies can only address damages through the date of final judgment, requiring the Plaintiffs to file repeated lawsuits to address recurring breaches, always addressing past damages; (3) an equitable remedy is warranted, and (4) the public interest (including the interest of judicial economy) is served by such injunctive relief insofar as such relief will prevent repeated lawsuits addressing the same breaches.

177. Monetary damages are inadequate to compensate for future damage because of multiple variables, which include: (1) fluctuations in the price of oil, gas, and NGL

products; (2) unknown rates of decline of the production of the oil and gas wells producing royalties to the Plaintiffs and putative class members; (3) fluctuations between the difference in the "local" price and the "enhanced" market price affecting Classes 6 and 10; and (4) unknown drilling or re-working plans by the Defendants which will affect the volumes of future production.

## CLAIM SIX
## UNJUST ENRICHMENT

*CLASS NOS. 3 through 10 AGAINST ALL DEFENDANTS*
*(IN THE ALTERNATIVE TO BREACH OF CONTRACT)*

178.    All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein.

179.    As an alternative to Plaintiffs' breach of contract claim, the above-described conduct further provides an unjust enrichment to Defendants.  It would be inequitable and unjust for Defendants to retain the benefit of these deductions that rightfully belong to Plaintiffs and the members of the putative classes that are either not allowed as a matter of law or, alternatively, have been and are being taken in improper amounts.

180.    Plaintiffs and the members of the putative classes are entitled to all legal and equitable relief, including orders for restitution and equitable disgorgement, necessary to remedy this unjust enrichment.

## CLAIM SEVEN
## PIERCING OF CORPORATE VEIL

*AGAINST DEFENDANTS RICE DRILLING D, LLC, EQT PRODUCTION COMPANY, EQT ENERGY, LLC, and EQT CORPORATION*

181.    All paragraphs of this Class Action Complaint are expressly incorporated as if fully rewritten and re-alleged herein, specifically Paragraphs 102 – 133.

182.    Defendants EQT Production Company, EQT Energy, LLC, and Rice Drilling, D, LLC, are, directly or indirectly through intermediate subsidiaries, wholly owned divisions of EQT Corporation.

183.    Defendant EQT Corporation exercises complete and pervasive control over Defendants EQT Production Company, EQT Energy, LLC, and Rice Drilling, D, LLC, such that these entities act as mere instrumentalities of EQT Corporation.

184.    For all intents and purposes, Defendants EQT Corporation, EQT Production Company, EQT Energy, LLC, and Rice Drilling, D, LLC are fundamentally indistinguishable.

185.    Insofar as Defendant EQT Corporation denies any obligation to indemnify the Plaintiffs for the wrongfully deducted post-production expenses or otherwise underpaid royalties, claiming that such obligation lies entirely with Defendants EQT Production Company, EQT Energy, LLC, and Rice Drilling, D, LLC, such conduct constitutes a fraud or inequitable conduct designed to deprive its lessors of recovery against the solvent parent company.

186.    Accordingly, the Plaintiffs ask this Court for an order to treat EQT Corporation, EQT Production Company, EQT Energy, LLC, and Rice Drilling, D, LLC as alter egos, treating each as the "lessee" under the subject leases.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the following relief:

A.     Certification of this action as a class action;

B.     Compensatory damages exceeding $5 million;

C.     Injunctive relief, ordering that Defendants may no longer use sub-market prices, based on insider sales to affiliated entities, as a basis of royalty payments to Plaintiffs and the members of the putative classes (Classes 1 and 2);

D.     Injunctive relief, ordering that Defendants may no longer deduct "post-production" expenses from future royalty payments to Plaintiffs and the members of the putative classes addressing those lessors with "market enhancement" provisions in their leases (Classes 3 through 10);

E.     Equitable relief, including an order of restitution and an order for equitable disgorgement;

F.     A finding that EQT Production Company, EQT Energy, LLC, and Rice Drilling D, LLC are the alter egos of their parent company, EQT Corporation, and further order that EQT Corporation is liable for any judgment rendered herein;

G.     Pre-judgment interest;

H.     Post-judgment interest;

I.     Costs of this action;

J.     Attorney's fees and costs involved in prosecution of this lawsuit; and

K.     Any other relief this Court deems just and appropriate.


## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the other members of the putative classes, demand a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on all issues triable of right by a jury.

Respectfully submitted,

    */s/ Ethan Vessels*
Ethan Vessels (0076277)
*Trial Attorney*
FIELDS, DEHMLOW & VESSELS
A LIMITED LIABILITY COMPANY
309 Second Street
Marietta, Ohio 45750
Telephone (740) 374-5346
Facsimile (740) 374-5349
ethan@fieldsdehmlow.com

Shawn K. Judge (0069493)
Mark H. Troutman (0076390)
**GIBBS LAW GROUP LLP**
1554 Polaris Parkway, Suite 325
Columbus, Ohio 43240
Telephone: (510) 350-9700
Facsimile (510) 350-9701
skj@classlawgroup.com
mht@classlawgroup.com

*Attorneys for Plaintiffs and the Putative Classes*